The next case this morning is 19-1614, Wang Yan et al. v. ReWalk Robotics et al. Good morning and may it please the Court. Your Honor, I would like to reserve three minutes for rebuttal. Yes, you may have it. The claims under Regulation SK were disregarded below because the amended complaint did not mention either Regulation SK or Items 303 and 503 of Regulation SK. The Securities Act of 1934 specifically requires a company to, quote, state a material fact required to be stated therein, which would include any fact that would be required to be stated by a statute or a regulation. There is no dispute in this case that a Section 11 claim was alleged in the amended complaint. Counsel, let's divide it into your Securities Act dismissal of the claim and then the Exchange Act, okay? Your brother says he defends the district court ruling that you didn't specifically plead these special regs, but he also says even if the district court was wrong about that, you're pleading stone set forth a violation of those regulations. Can you tell me why he's wrong about that? Yes, Your Honor. The reason why is because when the 522 order was issued, in the order itself in June of 2014, false instability and associated injuries were identified by the FDA as associated with the rewalk device. So there isn't a question of if or when false and associated injuries were identified by the FDA as specified risks. Wait a minute. Where do you get that from? Because if you look at the document, it says we want you to schedule two device. We want you to do some follow-up testing to determine whether that is the case, whether there are going to be more injuries with this device than you would otherwise expect to such a level that the FDA might say you can't sell the device. They weren't making a finding. Weren't they simply asking the proprietor of the device to run a testing program so they would know whether there was any unusual result from this use of this particular device? Your Honor, two points with respect to your question. The first is in terms of what I said with respect to the false and the instability, those are direct quotes from the June 26, 2014 order. And you're right that there was no definitive finding about actual danger or what the rate of false was. That was the purpose of doing the study, to determine how often people were falling and how often the device was failing. So that with respect to the idea that the FDA never made any definitive conclusions, we are not saying that it did. What we are saying is that they did not disclose the fact that the Rewalp person, which was the core product that the company would sell and that would drive revenues, not only did we not know what the rate of the false was, but the purpose of the study was to in fact determine whether the device was safe and effective outside of a hospital or rehabilitation center. So when they made the statement in the registration statement that we have been ordered to conduct a study to determine the safety and efficacy of the device in an urban terrain, that vague statement was not sufficient to disclose all the material risks. Well, why wasn't it? If you're a reasonably sophisticated buyer of initial securities and theoretically you're supposed to be, why wasn't that sufficient to put you on notice that there was a risk? The reason why is because the market does not just consist of sophisticated investors. It consists of ordinary investors. And as the Supreme Court has noted, this is not an area of the law where investors can be assumed to have taken certain risks. There's a fundamental obligation on the company to disclose these facts. And just to get back to the idea that somehow there's a regulation here that I think faces an affirmative obligation, regardless of whether a statement is made to disclose certain facts, which would be known uncertainties or risks, any risk that would make the offering speculative or risky. Counsel, can I take you back a few steps? You know, you argue in saying the district court erred in saying you didn't plead regs S through K, items 303 and 503. You argue that those impose additional obligations beyond those imposed by the securities law. When I asked you about that, you immediately went into the same argument you use for the securities law, and you and Judge Stahl have had an interchange about that. I actually think it's a very hard question if you're asserting something has an additional obligation beyond what you have pled, whether you can be excused from having pled that. That is why I asked you about the secondary defense, which is there was no violation of 303 or 503. There was no violation of any additional obligations. So can you just give me a two-minute response to that argument? Your Honor, the two-minute response is that the FDA went beyond just stating that you need to comply with the post-market surveillance study requirements. It said that you need to do so. That's the same argument you're making for your Securities Act claim, right? Yes. Okay. So what difference do items 303 and 503 make here? Well, the difference is that I think the fact that they were told that there was a risk of serious injury or death, which would have alerted investors that the product was riskier than what they gave the impression in the offering statement, would have changed the total mix of information. Okay. Second question. Your claim seems to depend on failure to adequately disclose the risk. I'm a little concerned that the offering statement, when they describe the FDA's requirement for a post-marketing surveillance study, which is a terrible terminology, but that's what they call it, that what the FDA said was we want the study done in institutional and non-institutional environments, such as clinic, home, and community. The offering statement does not say that. It simply says in urban terrain, which is not at all the same thing. So then my question becomes, well, would an investor actually think that that distinction would be material to their decision to buy? Yes, Your Honor. I think that it certainly would. Why? And the reason why is, as we mentioned in our brief, and I will say it again, the term urban terrain is not defined. Does it mean walking outside the courthouse on the street? It certainly doesn't apply to suburban areas. It certainly doesn't apply to rural areas. I'm not even sure what it specifically meant. And if you look at the statements, just to give you a small slice of examples, the anecdotes that are being used are about people going out and dancing, you know, father-daughter dances in high school and things of that sort. So the statements that were made were about the safety and efficacy of the device outside an institutional setting. What they didn't disclose is that the FDA had concerns about whether, in fact, the device was safe and efficacious in that kind of an environment. This is what's confusing me. The prospectus twice refers to the risk of injury or death or serious injury that the product has, and then it tells you that the FDA wants you to do a surveillance study on safety and effectiveness. Well, what's an investor to think the FDA is interested in other than whether there's injury or death? Okay, so I think with respect to the disclosures that you're referring to, those were with respect to other risks such as product recalls, product defects, and long-term clinical data, which is not what the post-market surveillance study is about. What would a reasonable investor have thought when they said, oh, the FDA wants a study to be done to assure safety and effectiveness in urban terrain and to have non-clinical performance testing of the system's function and durability? I would think most investors would think the FDA, they've classified this as having low to moderate risk, but they want a study done. What are they doing other than trying to see if it's safe? I think what it does not tell you is that the FDA has determined that there is a risk of serious injury or death. Those risks are not obvious. But there wouldn't have been a study if they didn't think there was some risk. Yes, that's correct. And the prospectus tells you that it's been rated as, what, a low to moderate risk? Well, yes, all of that is correct. But I think the issue is when a normal investor reads this document, serious injury or death does not jump out at them. I think that's the issue. And the question is, if it wasn't a problem, why not disclose it? Because it was a problem. It would have made the investment less fancy than they made it sound. So I think that's the issue. My question is, if you're told the FDA thinks there's a risk and it wants a study done, that might not bother you. But if you knew the FDA thought there was a risk of serious injury or death and it wants a study done, that would bother you? Yes, because I think the investors would probably find that much more material. What did you think the risk that they were referring to was, other than injury or death? Well, I think that if you look at the FDA's order, it specifies... No, I'm talking about the registration statement. When you read in the registration statement that the FDA thought there was a risk and wanted a surveillance study showing reasonable assurance of safety, what risk did you think the FDA was concerned about? Well, it could be just pause, which are not serious injuries, and certainly not death. I think it's counterintuitive for someone to say, we're selling this exoskeleton, but by the way, you could wear it and die. I just don't think a reasonable consumer would think that. Your Honor, I just wanted to quickly move to the Exchange Act. We'll give you more time because we want to know about the Exchange Act as well. Okay, thank you. All right. So, no, you're not excused. Oh, sorry. Give us your best Exchange Act argument. So, I think... Is it that Mr. Yan may assert the claims, or is it that this other person you tried to bring in is an adequate plaintiff? And in answering that question, answer whether you want her as a class plaintiff or whether you are only saying she can pursue individual claims. I think the answer is that they're both equally strong. With respect to Mr. Yan, there are two ways in which he could get standing for the remaining claims. One is if the statements are the same. What was overlooked below is that the same exact misrepresentations that were made in the registration statement were repeated in an annual report in February. So, if the same misrepresentations, that is, the exact same misrepresentations aren't sufficient, nothing is. In terms of the common scheme to defraud, the point that I would make is there is no attempt made by the defendants to engage in any of the decisions that we cited, which are at odds with how the district court has approached the issue. Most of those cases involved a situation where there was a corrective disclosure and then some other false statement was made to minimize the effect of the bad information coming out. Under the test that the district court has applied, that's not sufficient to state a common scheme to defraud. That's certainly not the case here. We didn't even do so much as say that additional misstatements were made when the ultimate disclosure happened. This circuit has never adopted the common scheme to defraud theory that three of the district court judges here have adopted. It's a significant question of law whether we should adopt any such idea. I want to step back. If the Securities Act claims are insufficient, did you just concede that the Exchange Act claims are also insufficient? No, Your Honor, I did not. I think that the Exchange Act claims, in fact, get stronger because by September of 2015— Okay, so why should Mr. Yan, who has, if we decide there are no Securities Act claims, why should he, as a named designated lead plaintiff in a class action, be allowed to assert claims that he personally does not have anymore? Well, for two reasons. One, he also raised an Exchange Act claim based on fraud in the registration statement, which the court never ruled on. So there's that issue. And then the other issue is that because that claim wasn't ruled on, the idea that there's no common scheme to defraud, in effect, has never really been addressed. So that would be my first point. The second is, with respect to the other issue, there's no problem with Ms. Keller coming into this case. As we mentioned in our briefs, a majority of lower courts have allowed it. In fact, to not allow her creates this— all the issues that the Supreme Court said could be problems in American Fight, which is instead of waiting in the wings, people are going to be rushing to the courthouse. Look, the way I read China Agritech, maybe Keller could come in and assert individual claims, but she can't be a class claim. So I put the same question to you, which you haven't answered. Are you trying to have her as the representative to bring class claims if Mr. Yan can no longer do so on the Exchange Act? Yes, Your Honor, we are. And in fact— But it's not individual claims. No, it isn't. She's being offered as a named class representative. And respectfully, I wanted to point to the court that multiple decisions since China Agritech have been decided have allowed basically individuals to come in and become class representatives in ongoing actions. Courts have interpreted Agritech to only apply to new cases. This is not a new case. She's just trying to get into an ongoing action that has, in fact, not been dismissed because the dismissal was, in effect, without prejudice. And there was no dismissal when she was proposed. And under the court's decision in Forest Pharmaceuticals, until and unless the case is dismissed with prejudice, every member of the public class's claims are in fact ordered. Those cases you're referring to, I thought certification had been entered or at least was pending, a motion was pending for certification. Your Honor, that is incorrect. So in INRI-IPO, which was a brief, which was a case we cited, CHUM, which was a case that we cited, Suceedat Aranimah, which is also a case we cited, in all of these, there was no certification motion pending. So this idea that somehow things change once you have certification is just not correct. Many of the decisions that we cited in our opening brief didn't involve that stage. There was a procedure similar to where we stand now, which is this idea that if someone loses standing, do we just dismiss the case and get rid of it, or can someone else come in? And, in fact, most courts have said that people can come in, and most courts have said that China Agrotech is not some kind of bar towards doing that, because it only applies to new cases. In fact, I think at some level what's happening over here creates the issues that the Supreme Court said in China Agrotech would be avoided by allowing people to come into the case. As the Court's opinion makes clear, any kind of inadequacy or problem can be dealt with through intervention or amendment. What the Court said is you don't get second bites at the apple by filing new cases. So when she was proposed, when Ms. Geller was proposed, she was proposed in this initial case. There was nothing that would have prevented her from joining in the case. So I think I would just briefly want to mention one point about the merits of the claims, because they were not addressed. The fact is that things got worse for this company once it received the warning letter. There is a history of dereliction, of noncompliance, of repeatedly ignoring the federal agency over and over again. And the fact of the matter is that it was told in the warning letter that the device was considered misbranded. The fact that some kind of extreme regulatory action... That was because of their failure. The misbranding was because of their failure to actually do the study or produce the study, not anything else. Yes, Your Honor, and the consequences of that would be severe, which would be removal of the device, civil penalties, criminal penalties. Correct, but that doesn't go back to the initial argument that you're making. That's an argument that comes up well after the fact because they didn't do something they were supposed to do. This is why you need Keller. He doesn't do it for you. To the extent that you find that there isn't a common scheme to defraud, that would be correct. But as I mentioned, it's not just about the common scheme. In Priest, which is a lower court decision, it said if the same misrepresentations are made, we will allow another plaintiff to bring the claims. And I just want to reemphasize that the exact same misrepresentations that were made in the registration statement were repeated in the annual report, which was filed in February of 2015. But you need it the other way. The force of your argument of Keller's claim, as I understand it, is even if the registration statement wasn't inaccurate, after the fact, they misled us, fraudulently misled us about whether we were doing the study, could do the study, had been told or misbranded. All those things happened after the transaction. And Keller, you're saying, has standing to raise those. Yes, Your Honor, that's correct. Those are very different claims than the claim that, oh, the registration statement omitted enough about risk of injury. Well, I think the fact of the matter is that all of these claims fundamentally involve the idea that this was a risky product, that it had all these risks, and that unless they did this study, they would not be able to prove to the market that it had any kind of efficacy and safety. And that's the common theme. In Troll, there were different subject matters, but the overarching theme in the case were accounting improprieties. And that was sufficient to find a common scheme to defraud. It's the same thing over here. Here's the difficulty from my point of view. It is very easy to allege in a Securities and Exchange Act complaint that there was a common scheme to defraud from the very beginning because whatever was said during the Securities Act portion of the case was also said in the Exchange Act portion of the case. As Judge Kayada has just pointed out to you, you have a number of claims that are totally independent in your Exchange Act claim having to do with the failure to report to the public the fact that they were having trouble with the FDA and the FDA was being really critical of them for not doing this surveillance study, sufficiently so that the FDA sent them a warning letter that they don't disclose all of this. Those are really independent claims. Your original plaintiff didn't buy in reliance on those. Now you're trying to bring in a new plaintiff. I don't know whether you can do that or not. We'll have to look at all of this. But it's just too easy to plead common scheme to defraud and avoid the statute of limitations by doing that. And I'd be really reluctant to take that step. Your Honor, two points. First, yes, you are right that it's difficult to determine what constitutes a common scheme. But as I mentioned, and I will state this again, there is an easier test, which is did they repeat the same misrepresentations? And if they did, then... You have just gotten yourself into the soup with that answer. Thank you. Thank you. Thank you. Good morning, Your Honors. Doug Baumstein from White and Case on behalf of Rewalk and the individual defendants. It is categorically false that the FDA determined that the Rewalk personal was dangerous. The actual determinations that the FDA made were the opposite. The FDA actually determined that... Now you've started out with a straw man. Their argument isn't that you should have said the FDA determined it was dangerous. Their argument is that the FDA said because of a potential risk of serious injury or death, we want you to do a study in a non-clinical, non-institutional setting. That's their argument. They kind of shift between arguments. And this is important. Take some advice from us. Deal with the serious issues in the case. He has explained that if the words death and serious injury had been used as they were used by the FDA, investors might have taken a more serious look. I add to that the concern you heard me raise earlier, that when the FDA says, look, we want testing done in institutional and non-institutional environments such as clinic, home, and community, instead your client paraphrases and minimizes it and makes it in urban terrain. And the argument is that that combination did not fairly apprise the market of the risks of this defense. On the Securities Act claim. Okay. So two responses to that, Your Honor. First of all, the FDA actually determined, quote, the safety and effectiveness of the rewalk has been demonstrated in an institutional environment. Only an institutional environment. And that is not the market. Your client was after. Correct, Your Honor. And what Section 522 of the FDA Act is, it is a requirement to look what happens after a product has been sold to follow along to see if there are potential issues. There was no finding that there were potential issues. Just the same way an elevator can be damaging if it were to malfunction, so too can the rewalk be damaging if it malfunctioned. But that was warned about. What was actually in the registration statement says, quote, if any part of the rewalk's hardware or software were to fail, the user could experience death or serious injury. That's in Appendix 121. That is precisely the risk that the FDA was concerned about. Not quite. That refers on to the risk of product failure. Well, but actually if you read what the FDA says. If you have a risk, you can have the product, software, and hardware perform perfectly properly, and yet in a non-institutional setting, it doesn't do the job. Well, what FDA said was, and again this is a quote, and I'll give you the site, FDA believes that Class 2 special controls provide reasonable assurance of the safety and effectiveness of the device type. And that's Appendix 275. But now you're back to where you opened, which is you're trying to make the proposition the FDA didn't decree the product unsafe. All right. But that's not the point. The point is the FDA did want a study done to see if there was serious injury or death in a non-institutional setting. In your registration statement, instead of quoting them, paraphrase them. And so the issue is, is the paraphrase materially different enough that it downplays by omitting some of the words and using urban terrain? No, Your Honor. Why not? Why is your paraphrase the equivalent of what the FDA itself said? Okay. Because what the FDA said, when they say a non-institutional setting, I think a person of reasonable intelligence, in fact, under the securities laws, you need to get information in ways for common people to understand. Non-institutional setting is much more terminology. Urban terrain, you think, well, I think stairs. I think walking down the street. I think that is a reasonable interpretation. You mean cities. Your Honor, frankly, that argument, I think, is quite silly that someone would say, well, it's urban terrain, but in the suburbs, you know, it doesn't work in the mall. I don't think that's a reasonable – people of ordinary intelligence would interpret it that way. I don't think that that is a reasonable interpretation of a requirement that is disclosed that we have to do a post-market surveillance to make sure that this is safe. Obviously, you're making sure it's safe doesn't mean that there's a finding that it was. Yeah, it's not standing alone. It's part of this sense that this company somewhat cutely did not inform the market of the risks and what the FDA had said, and you put the package together. And that, I think, is not a silly argument. I'm sorry, you think that paraphrasing is a non-issue. I happen to think it is an issue. It would have been very easy for your clients not to paraphrase. And so there's some question about, well, why are they doing it? Are they trying to hide information from the public? No, Your Honor. I believe that it is consistent with the securities laws to put words into plain English. And I think urban terrain is better than saying – In institutional and non-institutional environments such as the clinic, home, and community. Could have just said, in clinics, homes, and communities. I don't think there's a fundamental or material difference between homes and communities and urban terrain. I think that that is a – I think one of those actually – when you write institutional and non-institutional environment, I think people naturally tune out from that type of disclosure. I didn't repeat those words. All right. Let's turn to the Exchange Act. Sure, Your Honor. So with respect to the Exchange Act, one of the things that I think their primary – I know that they didn't want to necessarily focus on one or the other. One of the primary arguments they've been making is that Geller should actually be permitted to pursue these claims notwithstanding the running of the statute of limitations. And they made the argument that China Agritech is not limited – is only limited to successive actions. And I want to point to a decision no more than two weeks old out of the Southern District of New York, and it's Judge Kaplan's decision in Dennis v. J.P. Morgan Chase, 2020, Westlaw 729789. Send us a 28-J letter after argument, please. I will, Your Honor. But in J.P. Morgan, what the court did, it noted that American Pipe itself concerned interventions, but was subsequently extended to cover successive actions, and concluded that, quote, it would be strange to say that the tolling rule applies regardless of how a plaintiff seeks to join a lawsuit, but China Agritech's limitation on that rule applies only when a plaintiff initiates a new action. That logic plainly applies here. Further, if you look at the logic of China Agritech, especially it talks about someone waiting in the wings. Well, Geller here has been waiting in the wings for a long time. We moved to dismiss on standing long before Geller showed up. Additionally, and this goes to Justice Sotomayor's concurring opinion in China Agritech, the PSLRA has an entire process for the selection of lead plaintiffs. And if Ms. Geller wanted to come along, she needed to do that then. The fact is, it is completely improper for her to wait and then seek this as a class claim. We're not arguing anything about individual claims. So walk me through the thinking that we would incentivize or disincentivize. Assume you represent an unnamed class member and you think there is a 5% chance that the punitive named class member who brought the case might have some problem with continuing on with the case standing or some other reason. What do you do? So the appropriate thing to do would be to timely intervene, to basically say, court, if there is a standing issue, I would like to join as a backup. And so if we adopt your ruling, we would, in effect, be telling unnamed class members they have to do that or else they'll be at risk that the named plaintiff. And you have to do it before there's any ruling on whether the named plaintiff has a problem. Fundamentally, yes. But that's consistent with the Supreme Court's rule in China Agritech. And in fact, it's also consistent with the PSLRA rule about the need to actually make a complaint. If you're perfectly comfortable not being the lead plaintiff if someone else is and someone else has come forward and it looks almost certain but not quite certain that they'll do the job, you would have us hold that you better do something before the statute of limitations runs or you're at risk. Right. And that's actually the point of statute of limitations. Often you need to do something. But the whole purpose of American Pipe is to postpone people doing something. Yes, but for individual claims. If you want to do it as a class member, that's the point of China Agritech. You can't just do that as a class representative. So there is a distinction. You don't need to do that if it's just your individual claim. You can, in fact, wait on the sidelines. So let's go back to Mr. Yan. If he was a lead plaintiff, why does the elimination of his ability to bring a securities act claim eliminate his ability to bring an exchange act claim? Sure, because, of course, you can't. They're arguing on a common course of conduct. It doesn't really make sense or hold together here for a couple reasons. First of all, the court has already found that there was no misleading statement in the registration statement. It's not just a common course of conduct. It's a common course of fraudulent conduct. Mr. Yan, there is no fraud in the registration statement, so those statements can't be part of a subsequent action and bootstrap other allegations. And as the court's already pointed out, fundamentally the allegations here are of different conduct and different underlying issues. What the plaintiffs allege in the securities act is there was a failure to disclose the FDA's concerns. What they're fundamentally alleging in the exchange act is that Rewalk failed to disclose the status, the back and forth of the FDA interactions, and that that was somehow rendered other statements misleading. That is a big difference. They are fundamentally different claims. So there is no common course of fraudulent conduct. There was different conduct, and Judge Saylor correctly found that. Could you go back to the Geller joining, so I'm understanding exactly your interpretation? Sure. In other words, you would say the statute of limitations sets forth an immovable bar date for anyone who wants to bring a class action, period. I think that that is fundamentally what China Agritech now means, yes, especially as it relates, I would further say, in cases involving the PSLRA, where you do have this lead plaintiff appointment process. And I guess you would say if that's not right, then you could have an unending daisy chain. That's right. Geller could join, and so suppose three years from now, Geller didn't have standing, then Smith could join and haught on forever. Right, which is exactly the risk that was warned of in China Agritech, and why China Agritech basically said we want to put an end to that, right? For class actions, they're different. That's fundamentally what China Agritech is recognizing. It's saying we're happy for people to preserve their individual claims. We don't want people to feel like they need to take an action to preserve that. What China Agritech does is it says, but you can't do that on behalf of others, right? That's a different procedure. It matters. It's fundamentally different. And that's the limitation that I would put on, and I think that that is the limitation that the Supreme Court has put on. And I think that is, by the way, it is exactly the limitation that Judge Kaplan noted in the case that I'll be submitting a Rule 28J letter. What do we do with all of those cases? I know we're ping-ponging you between the two putative plaintiffs, but what do we do with all of those cases that say, yeah, as the lead plaintiff in a class action under the PSLRA, by congressional definition of lead plaintiff, can bring more claims than those he's personally interested in? Right. Well, I think Judge Saylor actually got it right when he said the difference here, and this goes back to the SUMA IV case, is that it's okay if maybe you're there for four statements and you're not there for three others, but that's fundamentally different than showing up when you are there for zero statements, which is necessarily the case once Judge Saylor has determined that there are no Securities Act claims here, which he did. And once he did that, he said, okay, well, what's the consequence? And he rightly found that the consequence is, yeah, you no longer have standing. And lacking standing, he cannot even move to have Geller replace him or amend the complaint. Standing is a very odd concept to be using on these facts, which basically has to do with being a lead plaintiff in a class action, and you're losing your ability to bring other claims that you personally have not been interested in. Okay. Okay. Thank you. Your Honor, just a few points. The first is, with respect to the Securities Act claim, I believe the bench had a question about, well, was it sufficient for them to disclose that they were doing this study to determine safety and efficacy in an urban terrain. One thing that I wanted to mention is, and this would be found on A50 of the record, this is in the complaint, in terms of the consciousness of guilt. In the annual report, the statement about why they were going to do the post-market surveillance study was omitted, and this was alleged in the complaint. And I think that's powerful evidence of the fact that once things began to deteriorate and get worse, they didn't even want to talk about the subject. The other point is, earlier on, I believe that, Your Honor, your question was about, well, what do we do with Geller in terms of we allow her to be in the case and what happens to the other statements. I apologize if I didn't address that as directly as you wanted me to. Yes, she definitely has standing for all of those Exchange Act claims. Yeah, that's not the issue. The issue is whether she's too late to appear as a class action kind of. Right. And I think the issue there is, as you mentioned, which is absolutely correct, that this is a case that was brought under the Private Securities Litigation Reform Act. It has a lead plaintiff who, under statute, has fiduciary obligations to a potential class. The fact that some of his claims may have been dismissed does not mean that he stopped being a lead plaintiff. He did exactly what he was ordered to do. The court ordered him to file a supplemental brief. His fiduciary obligations do not end until the entire round of litigation ends all the way up to the appeals. Now, in terms of the timing, going back to the case, the Forrest Farmaceuticals decision from 2019, it dealt with China Agritech, and the court said that, I believe, the way that it described its wording, it said it applies only to new cases, not ongoing actions. We're going to have to decide for ourselves what China Agritech means. It's helpful to know what other people think, but I think Judge Kayada's line of questions about incentives and disincentives may prove to be more important to us than the fact that some district court judges have differing views on this. Do you have anything to say in response to that? Yes, absolutely. That's a very good point, and I think there's a concession from the defendants that they actually want people to come and intervene and assert their rights. That's specifically what the Supreme Court discouraged in American Byte. What do you say about the daisy chain issue? In other words, suppose we agreed with you that Geller could come in, and then two years from now, Geller for some reason drops out. Could another person then at that point move to intervene here, and on for 175 years? Well, I think that since tolling is an equitable principle, it would depend on certain situations. So, for instance, if there's an obvious defect in standing, which is not the case here, at least we have a credible claim to bring to say that he has standing for all the claims. Suppose Geller just abandons the class, settles individually? Your Honor, I believe that if the case is certified, she would not be. Not known prior to certification. Well, I think that that would still be an obstacle because as the lead plaintiff, she would have responsibilities to the class. I think she would have to withdraw from the class. Suppose it turned out she didn't buy the security or there was some other defect. In other words, I think the logic of your argument is that other than some equitable discretion, you could have people forever continue to intervene in this case. So I think to the extent that you may be concerned about that, you don't even have to reach that issue. Because here, I believe that she came into the case before the statute of limitations expired. And in any event, she basically came into the case also before the case was dismissed. In Forrest Farm's records, the court had said that the claims of individual members who are also not part of an ongoing class action are told prior to dismissal. When you say she came in before the statute of limitations expired, you mean before it expired as extended in American Fight? No, Your Honor. I mean before the two-year period expired. And the reason why is because the Exchange Act claims were not raised until, I believe, August of 2017. And there's case law on this that the clock starts to tick when the notice or when the defendants are provided with notice that there's a fraud claim alleged. I don't recall this argument in the record below. Your Honor, it's in our opening brief. I believe that we had cited a case, a recent one from the Southern District of New York, that said, which was similar to what happened here, which is initially a complaint inspired in past Securities Act claims, subsequent complaint inspired with Exchange Act claims. The court said that was the first time that the defendants would have had notice because evidence of scienta was presented. And so the statute of limitations based on that standard wouldn't have run until 2019. And I believe she was proposed as a plaintiff in 2018. Unless the court has any other questions, I would rest. Let me just stay with it because I'm confused on why you're arguing China Agritech if the statute of limitations hadn't even run. Your Honor, that's an alternative argument in case the court had found that she was not brought within the statute of limitations. And, yes, I'm glad that you brought that up because the court may not even have to deal with any of those issues if it believes that she was proposed within the statute of limitations, in which case the relation-backed doctrine saves the claims. Mr. Bomstein, thank you. I'd like one minute from you in response to the argument that the claim was timely. Please. Well, Judge Gallardo is actually correct. That argument was not raised below or preserved below. In fact, in their papers, they talked about the claim having accrued more than two years before the claim was brought. I'm sorry, before Geller was proposed as a lead plaintiff. So it was not preserved below. In any event, all of the elements of the claim were certainly knowable to the lead plaintiffs in advance. In this case, the facts had all accrued by then. And then the last point that I would bring up on this, and it is easily lost here, is that the Exchange Act claims, they were brought, in large part, we believe, strategically to avoid a stay because there was a parallel state court action that had only Securities Act claims. That's subsequently been dismissed. But basically, they said, well, you can't stay us because we're going to add Exchange Act claims. And that was the first time. There had been lots of complaints filed here, including by lead plaintiffs before the amended complaint, that didn't even include those claims. So we think this was a late added claim, strategically. Okay. Thank you both. Thank you. The court is going to take a recess before the next argument. All rise, please. The court is adjourned. Thank you. Tables, please. Counsel, don't stray. A lot of folks similarly.